RAB:CSK

# M11-205

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

SOPHIA BRODSKY and
ARNOLD COHEN,

                Defendants.

- - - - - - - - - - - - - - - - -X

<u>To Be Filed Under Seal</u>

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF
APPLICATION FOR
<u>ARREST WARRANT</u>

(18 U.S.C. § 1349)

EASTERN DISTRICT OF NEW YORK, SS:

       MARIA ALBRIGHT, being duly sworn, deposes and says that

she is a Postal Inspector with the United States Postal

Inspection Service, duly appointed according to law and acting as

such.

       Upon information and belief, in or about and between

January 2007 and May 2010, within the Eastern District of New

York and elsewhere, the defendant ARNOLD COHEN, together with

others, did knowingly and intentionally conspire to devise a

scheme and artifice to defraud life insurance companies, and to

obtain money and property in the custody and control of the

insurance companies, by means of materially false and fraudulent

pretenses, representations and promises, and for the purpose of

executing such scheme and artifice, to cause mail matter to be

delivered by the United States Postal Service and a private and

commercial interstate carrier, to wit: Federal Express, UPS,

Airborne Express and DHL, contrary to Title 18, U.S. Code, Section 1341.

(Title 18, United States Code, Section 1349).

Upon information and belief, in or about November 2009 and March 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SOPHIA BRODSKY, together with others, did knowingly and intentionally obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that the defendant and others obtained property, to wit: payments from John Doe IV and other victims, with the consent of John Doe IV and those other victims, relating to the involvement of John Doe IV and those other victims in the business of life insurance, which consent was induced through wrongful use of actual and threatened force, violence and fear.

(Title 18, United States Code, Sections 1951(a), 2 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

I. Introduction

1.  I am a Postal Inspector of the USPIS, duly appointed according to law and acting as such.  I have been a

---

[1]  Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not set forth all of the facts and circumstances of which I am aware.

2

Postal Inspector for approximately seven years and am currently assigned to a unit where I am tasked with investigating, among other things, fraud and money laundering offenses. During my tenure with the USPIS I have participated in many mail fraud, wire fraud and money laundering investigations.

2. The facts set forth in this affidavit are based on my interviews of witnesses, information obtained from others in law enforcement who participated in the investigation and information obtained from my review of documents, including transcripts of tape recordings, some of which have been translated into English, emails and other documents. In the portions of this affidavit that describe the contents of documents or statements of witnesses, they are reported in substance and in part, unless otherwise indicated.

3. Since approximately the summer of 2009, the USPIS and other law enforcement agencies have been investigating individuals associated with Liberty Planning, Inc., a general life insurance agency, for mail fraud, wire fraud and money laundering in connection with a scheme to defraud life insurance companies. The USPIS began its investigation around the time it received a report of an internal fraud investigation conducted by Company A, a life insurance company, concerning a large number of multimillion dollar life insurance policies that Company A believed that Liberty Planning and Liberty planning's affiliated

3

licensed life insurance agents had fraudulently induced Company A
to issue.    During the course of the investigation I have spoken
to other law enforcement officers, interviewed witnesses and
reviewed documents.   The evidence developed during the
investigation, consists of witnesses' statements, including those
of three confidential informants who participated in the scheme,
thousands of court-authorized intercepted telephone and text
message communications, emails to and from many different email
accounts seized through the execution of search warrants,
documents from hundreds of bank accounts, tax records reviewed
pursuant to open tax investigations and 26 U.S.C. §6103(i)(1) and
information collected during the Company A internal fraud
investigation.   That evidence has demonstrated the existence of
the fraudulent life insurance scheme described below.

II.   The Organizers and The Organizers' Related Companies

4.   In order to fully describe the scheme, I will first
identify six central coconspirators in the scheme (the
"Organizers"), John Doe I through John Doe VI.

5.   Liberty Planning, Inc. ("Liberty Planning") was a
general insurance agency located in Monsey, New York.   The
Organizer John Doe I was the Vice-President and Managing General
Agent of Liberty Planning.   In the role of Managing General
Agent, he supervised licensed insurance agents affiliated with
Liberty Planning, and possessed authority to disburse funds from

4

Liberty Planning's bank accounts. John Doe I, together with others, also possessed the authority to disburse funds from the bank accounts of several entities, including The Rocklyn Group, Ltd. (collectively, the "John Doe I Related Companies").

6. The Organizer John Doe II was a licensed insurance agent affiliated with Liberty Planning and other insurance agencies. John Doe II, together with others, possessed the authority to disburse funds from the bank accounts of several entities (the "John Doe II Related Companies").

7. The Organizer John Doe III was married to a New York State licensed insurance agent affiliated with Liberty Planning.

8. The Organizers John Doe IV and John Doe V, who were brothers, together with others, possessed the authority to disburse funds from the bank accounts of several entities, including The Blue Rock Group LLC and The Bold Associates Inc. (collectively, the "John Doe Brothers' Related Companies").

9. The Organizer John Doe VI was a licensed certified public accountant. John Doe VI encouraged some of his elderly clients and the elderly clients of other accountants to apply for life insurance policies through Liberty Planning, as the insurance agency, and agents affiliated with Liberty Planning, including the defendant John Doe II, as the licensed agent.

III. Life Insurance Agents and Companies

10. Generally, life insurance companies enter into agreements with licensed insurance agents to sell the companies' policies. Agents find potential insureds or other persons with an insurable interest in an insured's life ("owners") who wish to purchase policies on an insured's life. If an insurance company approves an insured's or an owner's application for a policy, the sponsoring insurance agent receives a commission from the insurance company consisting of a percentage of the premiums that the insured or the owner pay to the insurance company. Insurance agencies with which insurance agents are affiliated also receive a share of such commissions.

11. During the first year that a life insurance policy is in effect, the commissions on the policy typically exceed 90% of the premiums paid. The higher the benefits that an insured or owner will receive upon an insured's death, the higher the cost of the premiums paid to the insurance company. For example, a policy that will pay many millions of dollars upon an insured's death will typically cost hundreds of thousands of dollars in annual premiums.

12. Under New York law, only an insured or a bona fide owner such as a close relative may purchase an insurance policy on an insured's life. At a later time, however, an insured or owner can sell the policy to anyone.

6

13. Generally, insurance companies will not knowingly sell a life insurance policy if the purchaser of the policy intends, from the outset, to later resell the policy. Nor will insurance companies knowingly sell a life insurance policy where a third-party investor, rather than an insured or an owner, will pay the premium.

14. Insurance companies also will not knowingly sell a life insurance policy where the benefits that are payable upon the death of the insured are in excess of the amount needed to serve the specified purpose of the policy. For example, if the specified purpose of the policy is to protect the owner of the policy from lost income in the event of the insured's early death, and the insured's net worth and income are such that the insured cannot provide the owner with a great deal of money while the insured is alive, then the insurance company will not sell the owner a large policy on the insured's life.

15. Under New York law, if a life insurance company was induced through fraud to issue a life insurance policy, the company may sue to rescind the policy within two years of the date on which the policy was issued (the "contestability period"). Following the expiration of the contestability period, an insurance company cannot sue to rescind a life policy regardless of the circumstances.

7

IV. Mail and Wire Fraud Scheme

16. From in or about and between January 2007 and May 2010, both dates being approximate and inclusive, the Organizers, together with others, engaged in a scheme designed to fraudulently induce insurance companies and their corporate subsidiary and related companies (collectively, the "Insurance Companies"), to issue policies with high death benefits to elderly insureds. On policies that were part of the scheme, the licensed agent who sold the policy was one of the Organizers or their associates, and the general insurance agency was Liberty Planning or another insurance agency with which one of the Organizers or their associates was affiliated.

17. In furtherance of the scheme, the Organizers caused the submission of applications to the Insurance Companies for said policies with false statements. These false statements induced the Insurance Companies to issue the policies and to charge lower premiums than they otherwise would. The false statements were that: (1) the insureds had very large net worths and annual incomes; (2) neither the insureds nor the owners had any intention of reselling the policies on the secondary market for life insurance; (3) the insureds and the owners would pay the premiums themselves with their own money; (4) neither the insureds nor the owners were compensated for applying for the policies; (5) the insureds and the owners did not obtain, and

8

would not hold the policies for others who were investing in the insureds' lives; and (6) the purpose of the insurance policies were "estate planning," "estate liquidity," "estate conservation" or some equivalent description. During the periods of contestability of such fraudulently induced policies, and in furtherance of the scheme, the defendants made additional false statements, such as telling insurance companies, when asked, that they did not know that investors paid premiums on any of said policies, and engaged in additional fraudulent conduct, such as repeatedly transferring money paid by investors between various bank accounts to conceal from the Insurance Companies that investors were paying premiums on said policies.

18.    It was a part of the scheme that the Organizers, together with others, recruited elderly people of modest means (the "Straw Buyers") to apply for life insurance policies with high death benefits from one or more of the Insurance Companies. The Organizers, together with others, paid and promised other financial incentives to the Straw Buyers in exchange for the Straw Buyers submitting applications for life insurance policies to the Insurance Companies.

19.    It was a part of the scheme that the Organizers engaged in financial transactions designed to falsely convince the Insurance Companies that the Straw Buyers were paying the premiums on the policies. In fact, the Organizers paid the

9

premiums from the bank accounts of companies that they controlled. These bank accounts were established in the names of irrevocable life insurance trusts for the Straw Buyers (the "Straw Buyers' Trust Accounts"), and were funded by the Organizers and other third-party investors. In order to conceal the source of the funds deposited in the Straw Buyers' Trust Accounts, the Organizers caused money to be exchanged among and between themselves, Liberty Planning, the John Doe I Related Companies, the John Doe II  Related Companies and the John Doe Brothers' Related Companies (collectively, the "Organizers' Related Companies") and the Straw Buyers' Trust Accounts, prior to payment of the premiums. These payments were made through the mails, by private commercial interstate carriers, and through interstate wire communications.

20. The Organizers' goal was to profit from the scheme through: (1) the death benefits they would collect if the Straw Buyers died before the periods of contestability expired; (2) the commissions that Liberty Planning, other general insurance agencies, the Organizer John Doe II and other insurance agents who participated in the scheme would receive from the premiums paid during the periods of contestability; and (3) the profits that the Organizers could make by reselling the policies on the secondary market once the periods of contestability expired.

V.   The Defendants' Conduct

21.   As shown below, there is probable cause to believe that some of the Organizers and the defendant ARNOLD COHEN conspired to fraudulently induce insurance companies to issue policies on ARNOLD COHEN's life.   There is also probable cause to believe that the defendant SOPHIA BRODSKY extorted some of the Organizers by causing them to pay her money in exchange for not reporting the insurance fraud described herein to law enforcement.

A.   The Defendant ARNOLD COHEN's Participation in the Insurance Fraud Scheme

22.   Insurance company records show that in July 2007 the defendant ARNOLD COHEN applied to insure his life with three different insurance companies.   COHEN signed applications to Company C for $10,000,000 on July 10, 2007 and to Company A and Company B for $10,000,000 each on July 11, 2007.   All three of the policies were purchased through Liberty Planning with Organizer John Doe II serving as the licensed insurance agent. Based upon statements in his applications, the insurance companies issued policies that provided him with a total of $30,000,000 of life insurance.   Both Liberty Planning and John Doe II received commissions on these policies.

23.   On each of the three applications, the defendant ARNOLD COHEN signed as the proposed insured, Organizer John Doe VI signed as the proposed owner and/or trustee, John Doe II

11

signed as the licensed agent and, on a portion of the Company C application, John Doe I signed on behalf of Liberty Planning. Each of the three policies were owned, and had as a beneficiary, entities named ARNOLD COHEN Irrevocable Life Insurance Trust (each, an "ARNOLD COHEN Trust"). The Trustee on each ARNOLD COHEN Trust was Organizer John Doe VI.

24. On each of the three applications the defendant ARNOLD COHEN and John Doe VI stated that COHEN's net worth was $46,000,000 and his annual income was $2,250,000. Indeed, John Doe VI wrote a letter, dated July 17, 2007, addressed "To Whom It May Concern" (the "July 17 Letter") attached to the Company B application, in which he stated that he and his firm were the accountants for COHEN and that the net worth and annual income figures contained in the application were correct.

25. COHEN did not file a federal tax return for 2007, suggesting that he did not earn $2,250,000 that year. Further, a public database search of COHEN's assets did not disclose assets approaching $46 million. An Accurint[2] search disclosed that COHEN owns only two properties: (1) a property in Elkins Park, Pennsylvania, co-owned with the defendant SOPHIA BRODSKY, purchased for $238,000 with a mortgage, with a current value of $385,000; and (2) an apartment in Philadelphia, co-owned with

---

[2] Accurint is a publically available database that obtains information from public real estate recordings around the country.

Merrill Cohen, purchased in 2000 for $100,000 using a mortgage taken on the Elkins Park property, and having a market value of $64,000. Nor do COHEN's bank records disclose significant assets. As of March 2008, COHEN had a balance of less than $10,000 in his personal bank account. Further, according to a confidential informant ("CI1"), another Straw Buyer, John Doe VI told CI1[3] that CI1's net worth had to be inflated so that CI1 and the Organizers could induce the insurance company to issue the policy on CI1's life. Finally, COHEN reported on his application to Company B that he never declared bankruptcy. However, court records reveal that COHEN filed for personal bankruptcy on October 5, 2005. In his 2005 bankruptcy petition COHEN stated that his estimated net worth was between $0 and $50,000, that his assets were worth $1,000 and that his total liabilities were $25,700.

26. In one or more of his three applications, the defendant ARNOLD COHEN made each of following statements: (i) that neither he nor any other person was being compensated or would be compensated in connection with the application, (ii) that the premiums were not being financed by a third party, (iii) that the insurance was being purchased for the benefit of COHEN

---

[3] CI1 does not possess a prior criminal record. The information CI1 provided concerning the scheme has been corroborated by other evidence, including consensually recorded conversations between CI1 and John Doe VI.

and the beneficiaries of the policy, (iv) that there had been no discussions about the sale of the policy, (v) that COHEN expected to keep the policy for at least five years, and (vi) that the purpose of the insurance was estate planning.  In an agent's report attached to the Company A application and signed by John Doe II, John Doe II stated that there was no intention to change ownership of the policy and that no portion of the premiums would be financed.  As shown below, the foregoing statements were false.

27.  Bank records show that the defendant ARNOLD COHEN did not pay the premiums on the policies on his life.  Rather, the premiums on the ARNOLD COHEN life insurance policies were, like the other policies that were a part of the Organizers' scheme, funded by third parties, including some of the Organizers.  The Organizers sought to conceal this fact by repeatedly transferring the money used to pay the premiums through the Organizers' Related Companies before any payments were made.  For example, on March 21, 2008, March 24, 2008 and March 25, 2008, respectively, a Straw Buyer Trust Account for Straw Buyer A paid a premium to Company D on a policy issued to Straw Buyer A, an Arnold Cohen Trust paid a $221,250 premium on a Company C policy issued to COHEN, and a Straw Buyer Trust Account for Straw Buyer B paid a $180,000 premium on a Company B policy issued to Straw Buyer B.  Each of these three trust accounts

14

received the money to pay these premiums from The Blue Rock Group, which in turn received the money from The Bold Associates, which in turn received the money from John Doe IV and The Rocklyn Group, which in turn received the money from four insurance companies as commissions paid to Liberty Planning and John Doe IV on policies issued to nine different Straw Buyers.[4]  No portion of these three premium payments were paid by Arnold Cohen or Straw Buyers A and B.

28.  Pursuant to an order issued by the Honorable Sandra L. Townes, United States District Judge, Eastern District of New York, the government intercepted calls between the defendant ARNOLD COHEN and John Doe IV on January 25, 2010, January 27, 2010 and March 2, 2010.  During those calls COHEN demonstrated that, notwithstanding his statements on the applications that he would pay the policy premiums, he was not. For example, during the March 2 call, COHEN asked whether "the people [are] still paying the premium[s]."  John Doe IV responded "the people over here stop paying premium now because [Company B] froze the policy."

29.  Similarly, contrary to the defendant ARNOLD COHEN's statements to insurance companies that he was not being compensated in exchange for applying for the policy, from March

---

[4]  As noted above, The Blue Rock Group, The Bold Associates and the Rocklyn Group Ltd. are among the Organizers' Related Companies.

14, 2008 to August 24, 2009, COHEN received in excess of $5,200 from The Blue Rock Group.  I believe that money to be compensation that COHEN received in exchange for applying for the policies.  In addition, intercepted telephone calls and bank records reveal that (i) on January 28, 2010, COHEN received $21,666.67 as a portion of the proceeds of the sale of the Company A policy on his life, and (ii) on or about December 29, 2009, COHEN received a payment of $25,000 from the sale of the Company C policy.  During intercepted telephone conversations on January 21, 2010 and January 27, 2010 between COHEN and John Doe IV, the two men discussed how the "money [from the sale] came in" and made arrangements to get COHEN his share.

30.   Finally, it should be noted that the defendant ARNOLD COHEN refused to cooperate with Company A's investigation, as did the licensed agent on his policies, John Doe II.

31.   The United States mail, private commercial interstate carriers and interstate wire transmissions were used to further the fraudulent scheme described herein.  For example, on or about September 26, 2007, Organizer John Doe I sent to Company A through the mail a letter enclosing a premium check and insurance documents on a Company A policy issued to the defendant ARNOLD COHEN.  On or about September 11, 2007, Company C transmitted over the interstate wires $196,750 to Liberty Planning for commissions on the Company C policy issued to ARNOLD

16

COHEN.

32. Intercepted telephone calls, analysis of bank records and review of emails reveal that the conspiracy occurred in Brooklyn and Oceanside, New York, among other places. Analysis of bank records show that the premium payments on the ARNOLD COHEN life insurance policies were made from ARNOLD COHEN Trust accounts opened at banks in Brooklyn. Such accounts also received funds directed to them by the Organizers. For example, John Doe I wire transferred hundreds of thousands of dollars to an ARNOLD COHEN Trust account opened in Brooklyn which money was then used to pay premiums to one of the Insurance Companies. The government also seized emails to and from the email accounts of John Doe IV and John Doe V. These emails, together with intercepted telephone calls reveal that John Doe I, John Doe II, John Doe IV and John Doe V exchanged spreadsheets containing details about transactions performed with the commissions earned on the policies that were part of the scheme, including the ARNOLD COHEN policies. These spreadsheets show that some of the commission money was reinvested in the scheme through payments to Bold Associates, which is located in Brooklyn.

B. The Defendant SOPHIA BRODSKY's Extortion of the Organizers

33. During the course of the insurance fraud scheme detailed herein, three $500 checks from one of the John Doe Brothers' Related Companies to the defendant ARNOLD COHEN were

17

deposited into the defendant SOPHIA BRODSKY's personal bank account.

34. In a telephone conversation between Organizers John Doe IV and John Doe VI that the government intercepted on January 25, 2010, John Doe IV told John Doe VI that, "she [referring to BRODSKY] sent in a letter to the settlement company[5]/ that she's blackmailing them, that she wants 25 grand, if not, she's going to the authorities. She sent a letter, along with a letter that she would send to the authorities."

35. Later that same day, John Doe IV and John Doe VI had the following exchange:

> John Doe IV: She still has that information, she could pass that information off; so we'll have to work it out, OK?

> John Doe VI: Oy!. What? Are you going to give her $10,000 and then she's gonna blackmail you again?

Later in the same conversation, John Doe VI stated:

> John Doe VI: And I am going to explain to you one thing. I kept my mouth shut on this one. She was supposed to get $15,000. And she was supposed to, remember, what that deal was, she was going to take him to the Doctor and everything.

36. Based upon my knowledge and experience, including my review of the recordings intercepted pursuant to the court-authorized wiretap in this case, I believe that in the above conversation John Doe VI and John Doe IV were discussing their

---

[5]/ A settlement company is a broker that arranges a resale of insurance policies. BRODSKY sent the letter to the settlement company that was arranging a resale of one Of the ARNOLD COHEN policies.

willingness to pay the defendant SOPHIA BRODSKY money in response to her threat to go to law enforcement, and their concern that she would continue to extort them even after they paid her. I believe that the reference to BRODSKY having a "deal" in which she would be paid $15,000 to take the defendant ARNOLD COHEN to the doctor, referred to John Doe VI and John Doe IV agreeing to pay BRODSKY to take COHEN to the doctor and help him convince the doctor that COHEN suffered from symptoms that he did not - a ploy that would increase the value of the policy on the secondary market by making it appear that COHEN's life expectancy was shorter than it really was.[6]

       37.  In a series of intercepted calls between John Doe IV and the defendant ARNOLD COHEN on January 21, 2010 and January 25, 2010, John Doe IV and COHEN discussed the defendant SOPHIA BRODSKY's extortionate demands. They agreed that if her demands were not met, they would all need lawyers, but they further agreed that they could not pay her $25,000, the amount she was demanding. Instead, the two men agreed that COHEN would call BRODSKY and try to get her to settle for $10,000, an amount they

---

[6]  CI1 told the government that John Doe IV gave CI1 a list of symptoms for Transient Ischemic Attacks, a serious disease that CI1 did not have. In a later consensually recorded conversation between John Doe VI and CI1, John Doe VI explained that by complaining to his doctor of symptoms that he did not have, CI1 could increase the value of his policy when they attempted to resell it.

would raise as a result of COHEN, John Doe IV and John Doe VI, each providing $3,500. In the last of the series of calls, COHEN reported to John Doe IV that he had contacted BRODSKY and that she agreed to take the $10,000.

38. Finally, in numerous intercepted calls and text messages directly between the defendant SOPHIA BRODSKY and John Doe IV, BRODSKY demanded money from John Doe IV. On February 23, 2010, for example, having not yet received the money that John Doe IV had promised her, BRODSKY sent the following text message to John Doe IV's telephone:

> I just spock (sic) to arnold we both going to distrek attorny (sic) on Friday

39. Bank records show that on February 25, 2010, the defendant SOPHIA BRODSKY was paid $10,000 from an ARNOLD COHEN Trust account that contained proceeds of the sale of the COHEN Company B policy. This payment was made from an ARNOLD COHEN Trust account opened at a bank in Brooklyn, New York.

WHEREFORE, your deponent respectfully requests that the defendants ARNOLD COHEN and SOPHIA BRODSKY be dealt with according to law.

WHEREFORE, your deponent further requests that this Affidavit be sealed until further notice of the Court to prevent the defendants from fleeing prior to their arrests.

MARIA ALBRIGHT
Postal Inspector
United States Postal Service

Sworn to before me this
____ day of _____, 2011.

UNITED STATES MAGISTRATE
EASTERN DISTRICT OF NEW YORK

21